## SAMUELS v. HOUSTON.

No. 125.

District Court, S. D. Georgia, Augusta Division.

June 30, 1942.

Roy V. Harris and Henry T. Chance, Jr., both of Augusta, Ga., for plaintiff.

Lee, Congdon & Fulcher and Wm. P. Congdon, all of Augusta, Ga., for defendant.

LOVETT, District Judge.

This is an employee's suit under sections 6 and 7 of the Fair Labor Standards Act of 1938[1] to recover the difference between the amounts paid and required, and for time and a half for overtime, with penalties, as prescribed by the Act. Jury trial is waived by the parties.

There is no issue as to the hours worked.[2] The defenses are, first, that neither the employee nor the employer for the time in question were engaged in commerce as defined by the Act, and, secondly, that the employer had a retail establishment the greater part of whose selling was in intrastate commerce, exempted by section 13[3] from the provisions of sections 6 and 7 of the Act.

The plaintiff offered no evidence on the hearing, contenting himself with the defendant's answer to his allegations and a stipulation that the defendant not only sold but also manufactured ice, and some part of the output was sold to customers outside of the State of Georgia, where it was produced, and some part to trucks *possibly* moving in interstate commerce.

The uncontradicted evidence discloses, and I find as a fact, the defendant during the time in controversy owned and operated a plant in Augusta, Ga., for the manufacture of ice, having a daily capacity of fifty tons; the total output while plaintiff was employed was slightly more than five thousand tons, of which approximately eighty-five tons were sold and delivered at the ice plant to customers residing in South Carolina and about forty tons delivered at the plant to motor trucks which may have been engaged in interstate commerce, no record being made in that respect. Thus, it appears at the most only about 2½% of the ice produced could have moved beyond the State of production. The plaintiff was employed about one hundred and twenty days. Upon an average something like one ton a day out of a total capacity of fifty tons could have found its way into commerce of the character contemplated by the Act as bringing employer and employee within its terms. The defendant sold the greater part of its output at retail. During the year 1941, and within the period of plaintiff's employment, from time to time the defendant accumulated a reserve stock or supply of ice. From this supply, when there was an excess above the regular demand of

---

[1] 29 U.S.C.A. §§ 206, 207.

[2] The employee worked from May 8 to August 28, 1941. The plaintiff accepts the computation of hours worked and pay received during the several work-weeks set out in the defendant's answer.

[3] 29 U.S.C.A. § 213.

the local customers in Augusta, occasionally ice was sold to customers in South Carolina or to trucks passing the plant. This type of business was not solicited by the defendant, and when no reserve stock was on hand it was refused. When the ice was manufactured it was not possible to foretell whether it would be consumed by local customers or would go into the reserve stock, as the local consumption varied with the state of the weather and from other causes.

The plaintiff was what is known as an "ice puller", his work being the pouring of water into the container in which it was frozen and when frozen pulling the ice from the container. He handled about one hundred and forty-five blocks per day, each block weighing three hundred pounds. The plaintiff has made no effort to point out what part of his work was intrastate and what part interstate; indeed, he could not do so as no one knew when the ice was made where it would go; and when made it became a part of a mass that could not later be identified or segregated. For aught that appears in the evidence no part of the ice which plaintiff helped to make during the three months and twenty days he worked for the defendant may have gone elsewhere than to the local customers in Augusta, Ga.

The ice sold by defendant to customers in South Carolina went to ice dealers or distributors there, and was sold at half the price received from the local trade[4]. This probably accounts for the fact that the defendant supplied these customers only when he had an excess of ice on hand which he could not sell at retail at home.

As pointed out by Mr. Justice Frankfurter in the Kirschbaum case[5], there is no "dependable touchstone" to determine in all cases whether employees are "engaged in commerce or in the production of goods for commerce". The courts have not, and can not, set up a satisfactory formula that will always serve. Lines must be drawn for each case as it arises. Certain considerations, however, that are relevant in this case, and to me are helpful in saying that the line shall go here rather than there, have been stated. One of these considerations is simply this: Is a substantial part of the employee's work for the time in question in commerce or in producing goods for

commerce, remembering at the same time the statutory definition of "commerce" contained in the Act? "The percentage of the employer's business intrastate as compared with that interstate proves little. * * * It is the employment of the particular employee and not the business of the employer, which is to be regarded. Yet the two are closely related, because the employee's work cannot be in commerce unless the employer's business is to that extent in commerce. On the other hand, the employer may be largely engaged in commerce, but the particular employee engaged in some other work, may not be. * * * If a substantial part of his work is in commerce or in producing goods for commerce, he must be dealt with according to the Act". Fleming v. Jacksonville Paper Co., 5 Cir., 128 F.2d 395, 397. See, also, Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172; Swift & Co. v. Wilkerson, 5 Cir., 124 F.2d 176. "The provisions of the Act expressly make its application dependent upon the character of the employees' activities". Kirschbaum case, supra.

The plaintiff here admittedly "pulled" ice a little less than four months for the defendant at its ice plant. But what became of the ice? Was it sold locally, within the state, or did some substantial part of it move in commerce beyond the State of Georgia where produced? The record is silent. True, some eighty-five tons certainly, and perhaps forty tons more, of ice were sold by the defendant and moved beyond the state while plaintiff worked for him, but when that ice was produced we do not know. It was shown to have been sold from the accumulated reserve stock, but when that stock accumulated or was manufactured—whether before or during the time the plaintiff worked at the ice plant—we are left to conjecture.

Section 15(a)(1) of the Act makes it unlawful to sell, with knowledge that shipment or sale in commerce is intended, any goods in the production of which any employee is employed in violation of sections 6 and 7, and by section 15(b) proof that any employee was employed within ninety days prior to the removal of the goods constitutes prima facie evidence that such employee was engaged in the production of such goods.[6]

---

[4] From the local trade defendant received 40¢ per 100 lbs., and from the ice dealers in South Carolina 20¢. These dealers usually took 10 to 15 blocks at one time.

[5] Kirschbaum v. Walling, 62 S.Ct. 1116, 1117, 86 L.Ed. ——, decided June 1, 1942.

[6] 29 U.S.C.A. § 215 (a) (1), (b).

Is this presumption met and overcome by proof that the employer has no interstate sales as a part of his regular business, that he solicits no such business, that he accepts it only when he has a surplus stock of goods on hand, his primary, important and profitable business being to supply the requirements of his local customers within the state, that such sales are casual, intermittent and incidental, and that at various times of the year he has no surplus and can not sell to interstate buyers? I think it is[7]. And may there not be added to this also, though not as controlling, the fact that only about 2% of the goods sold while plaintiff worked for it could have gone beyond the state, and it may have been less? I think it may. If it be said the defendant should have brought forward evidence showing when the ice sold during the time in question was manufactured, the answer is it could not tell,—it was not distinguishable from the mass on storage, and unlike some other commodities it is not a perishable product and may be kept indefinitely. Unless the presumption that the employee was engaged in the production of goods for commerce where he is employed within ninety days of the removal of the goods from the place of employment, created by section 15(b), is allowed to take the place of affirmative evidence of such employment, the plaintiff's case must fail because he does not point out what part of his work was intrastate and what part in interstate commerce. It has not even been shown that in any given work-week any substantial part of his work was interstate. See Super-Cold Southwest Co. v. McBride, 5 Cir., 124 F.2d 90; White Motor Co. v. Littleton, 5 Cir., 124 F.2d 92, concurring opinion of Judge Hutcheson at page 94; Fleming v. Knox, D.C., 42 F. Supp. 948(1), 949, 950.

I conclude that the plaintiff has failed to carry the burden the law places on him of showing by a fair preponderance of the evidence that a substantial part of his work was in commerce or in producing goods for commerce, so as to be entitled to the benefits of the Act of Congress on which he relies. See Drake v. Hirsch, D.C., 40 F.Supp. 290(2); Muldowney v. Seaberg Elevator Co., D.C., 39 F.Supp. 275(2).

There remains only the question of whether the defendant conducted a retail establishment of the nature exempted by the Act. He was both a manufacturer and a seller at retail. The process of manufacture necessarily came first. Later, he sold direct to the consumer at retail, as most ice manufacturers with small plants do. While processing incidental to retail selling will not alter the retail character of the business, yet an establishment engaged in manufacturing operations is not a retail establishment even though the goods it manufactures are distributed at retail. A custom tailor making clothes to order may be engaged in manufacturing while his neighbor, a haberdasher, selling custom-made clothes and altering them to suit the customer may be a retailer. The distinction between incidental processing and actual manufacture is quite real, though often one of degree. If a retail ice dealer buys from another the greater part of the ice he sells, the fact that he may manufacture some small part of it, though substantial, will not transform the business from retailing to manufacturing. In such a case, those who work in the distributing end should be segregated from those engaged in production. But the Fuller Brush people, if they manufacture—as I believe they do—remain manufacturers notwithstanding the Fuller Brush man may sell the output at retail to the housewives of the country. There is authority for a view contrary to those I have expressed on this point with particular reference to a manufacturer of ice in a border town, like Augusta, Ga., between two states, who sold his ice at retail. See Collins et al. v. Kidd, D.C., 38 F. Supp. 634. While I agree with what Judge Davidson there says as to the ice company and the employee not being engaged in interstate commerce, I am unable to follow his reasoning as to the manufacturer being exempt also because he was a retailer.

My conclusions are that the plaintiff is not entitled to recover.

Let a judgment be presented.

---

[7] See Goldberg v. Worman et al., D. C., 37 F.Supp. 778; Collins v. Kidd, D. C., 38 F.Supp. 634; Gerdert v. Certified Poultry & Egg Co., D.C., 38 F.Supp. 964, 965, 966(7), 970.