**Edgar W. DICKENSON, Jr., Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 19039.**

United States Court of Appeals Ninth Circuit.

Nov. 18, 1965.

Rehearing Denied Jan. 6, 1966.

Morris Sankary, Sankary, Sankary & Horn, San Diego, Cal., for appellant.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, Asst. U. S. Atty., Chief, Criminal Sec., Elmer Enstrom, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before CHAMBERS and BARNES, Circuit Judges, and McNICHOLS, District Judge.

CHAMBERS, Circuit Judge:

Dickenson, a San Diego auto parts dealer, was convicted of six counts under an information charging him with violations of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C. § 201 et seq. The charges concerned payment of wages to several employees.

We summarize:

1. Count one charged that Dickenson filed with the wage and hour administrator false receipt forms with respect to wages due workers Madrigal, Roberts and Martinez. In a stipulated civil contempt decree,[1] Dickenson had previously agreed to certain amounts due the three laborers.

2. Count two charged that Dickenson, between August 12, 1959, and August 12, 1961, did pay less than a dollar an hour to employees Cesena, Martinez, Rubalcava and Zertuche for work.

3. Count three charged that he worked the same four employees over forty hours a week during the same period mentioned in count two without paying them a dollar and a half an hour for overtime.[2]

---

[1] Dickenson had been enjoined in 1956 from violating the Fair Labor Standards Act. Under the injunction, the civil contempt was adjudged in 1959.

[2] Count two, in effect no wages at all for overtime work, was a charge of a failure to pay the minimum wage. Count three

4. Count four charged that for the same period he kept false records showing that the four employees named in count two worked less hours than they actually worked.

5. Count five, for the same period, charged that he failed to make, preserve and keep records for the various weeks of the period.

6. Count six charged that during the same period Dickenson transported, offered for transportation, or sold into "commerce" automobile parts and scrap on which employees had worked without having received the wages required under the act.

Throughout the charges the element of "commerce" as defined by the act [3] was stated and repeated.

After conviction, essentially the sentence was:

1. On count one, a fine of $1,000, probation and a direction to pay the three named employees certain amounts.

2. On count two, a fine of $1,000, probation, and a direction to pay the four employees mentioned in the count certain amounts.

3. On counts three and four, the same concurrent probation already provided in counts one and two.

4. On counts five and six, a fine of $1,000 on each count.

We do not have any inconsistent verdicts here, but we do think that consistency probably required an identical finding of guilty or not guilty on all of the counts two to six inclusive. As indicated, count one had a different set of facts.

We deal here with the Fair Labor Standards Act as it existed at the time of the alleged offenses.

Of course, the interstate commerce clause of the Constitution has grown and grown, but the Fair Labor Standards Act, while growing from time to time in sweep, has never reached as to inclusiveness the permissible sweep on interstate and foreign commerce. Generally, the act has dealt with goods "in commerce," interstate or foreign, and not with "affecting." And it has exceptions, such as the retail one with which we must deal here.

A business may have many facets, but under the act only the interstate-foreign commerce employees come under it.[4] And such employees may be in such commerce for one pay period one week and out the next.[5] Also, if a retail business meets the percentage test imposed, there may be some interstate-foreign commerce, and the employees working in the interstate-foreign aspect may not get the wages otherwise ordered by the act.

At the time of the alleged offenses, the act required, if applicable, the payment of a dollar an hour for the first forty hours of work in a week and a dollar and a half an hour for overtime.

It is quite obvious that Dickenson, percentagewise, was on the borderline of whether he was entitled to the retail exemption.

In pertinent part, Section 13(a), the retail exemption, provided:

"SEC. 13(a) The provisions of sections 6 and 7 [the amounts to be paid as a minimum] shall not apply with respect to—(2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State

---

was a failure to pay the rate for overtime wages. Thus, the government was not remiss in informing against defendant in every way it could.

3. Fair Labor Standards Act of 1938, § 3(b), 52 Stat. 1060, as amended, 29 U.S.C. § 203 (b).

4. See, e.g., Mitchell v. H. B. Zachry Co., 362 U.S. 310, 319, 80 S.Ct. 739, 4 L.Ed. 2d 753; Hagan v. Goldberg, 9 Cir., 291 F. 2d 249.

5. See, e.g., Guess v. Montague, 4 Cir., 140 F.2d 500, 504; Mitchell v. Owen, 6 Cir., 292 F.2d 71, 78–79.

in which the establishment is located. A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or both) is not for resale and is recognized as retail sales or services in the particular industry."

■ It is settled that in a civil case the government must prove the work was done in commerce (interstate or foreign) or in the production of goods for it, but then, once coverage is proved, the defendant employer must prove by a preponderance of the evidence that he was a retailer under the act, meeting the percentage tests for exemption. Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393. Defendant acquiesced in instructions placing the same burden (by a preponderance of the evidence) upon him here.

We think the government concedes that Dickenson met the 50 per cent test, but the disagreement is over the 75 per cent test of section 13(a), supra.

As to coverage, the dollar volume of scrap sold to other dealers as "commerce" (on which the employees with whom we are concerned worked) is very, very small. The three years of scrap sales were as follows:

1959, $285.25, or $\frac{3}{10}$ of one percent of sales;

1960, $145.95 or $\frac{1}{10}$ of one percent of sales;

1961, $84.65 or $\frac{1}{10}$ of one percent of sales.

The defendant says over and over again that this was de minimis and that he only sold the scrap (not salable as parts) to get rid of it so he could bring other old cars onto his lot to salvage parts. The government contends that not only cutting up the scrap and taking the scrap to the dealer for shipment was "commerce," but that all the acts of removing parts for sale helped prepare the ultimate product, scrap, and, ergo, this was producing goods. We do not decide that point either way, deeming it not necessary. The cases seem to stand for the proposition that one must know that there are a lot of other suppliers of scrap and probably a lot of other little ones like Dickenson, thus the whole picture is to be considered, and that a lot of little ones with underpaid wages could change the movement of goods in commerce.[6] As the case law has built up, de minimis does not mean much.

■ It is quite likely that Dickenson's employees named in the indictment were only engaged in the "commerce" during a few pay periods of the whole time mentioned in the information. But there again the law seems to be settled that, once shown to be in commerce, the employer's burden is to show in the pay periods thereafter that the employees were not in commerce.[7]

The defendant is convinced that his sales tax returns to the state of California, either alone or plus estimates of certain non-taxable sales, showed that clearly he had 75% of retail sales and thus the retailer's exemption took him out of coverage.

6. See Mabee v. White Plains Publishing Co., 327 U.S. 178, 182, 66 S.Ct. 511, 90 L.Ed. 607; United States v. Darby, 312 U.S. 100, 123, 61 S.Ct. 451, 85 L.Ed. 609.

7. 29 C.F.R. § 776.4; see, e.g., Guess v. Montague, 4 Cir., 140 F.2d 500. There appears no reason for limiting this rule in criminal cases. Compare Southern Advance Bag & Paper Co. v. United States, 5 Cir., 133 F.2d 449 (Government not required to show, in a criminal case, which particular pieces of pulpwood, which were made into paper, had rendered employer subject to the act); United States v. Ewald Iron Co., W.D.Ky., 67 F.Supp. 67 (failure of employer to keep accurate records created reasonable inference that employees were not properly compensated). The rule is analogous to that applicable in tax evasion cases which places upon the defendant the burden to show that he had other legitimate deductions once he is proven to be deficient in payment. See, e.g., United States v. Stayback, 3 Cir., 212 F.2d 313, cert. denied, 348 U.S. 911, 75 S.Ct. 289, 99 L.Ed. 714.

The act does not define, ipso facto, retail except to say that "it is not for resale and is recognized as retail sales * * * in the particular industry." [8]

■ Obviously, a state sales tax statute would not be conclusive. But with a jury in the box to the side of the bench, the trial judge must come up with a definition. We set forth as Appendix A the trial court's definition, which we consider well done.

The defendant had an expert who looked over the business and gave his opinion of the operation and concluded the business was within the exemption. But the jury was free to disregard the expert.[9]

■ We are satisfied that under the circumstances there was a jury question as to whether the whole business of Dickenson was a retail one under the act. If it was, the employees would lose their coverage.

Assuming coverage and no exemption, there was adequate evidence to sustain the verdict on all counts.

Some particular discussion is required on count one. That involved the prior stipulated civil decree wherein Dickenson was ordered to pay amounts to Madrigal, Roberts and Martinez. Not shown on the face of the prior civil decree to pay is the fact, which turned up in the criminal trial, that Dickenson claimed the three employees were indebted to him for advances for all or part of the amounts specified for overtime wages. So, he says, he insisted on "his" offsets and took receipts in full from the employees.

On count one, the court did not tell the jury that the stipulated decree in the prior civil contempt case established for all purposes or any purpose that the defendant was in non-exempt commerce and did not tell the jury that the defendant had no right to make the deductions. There is a good argument that such would have been proper. But we do not pass on it.

The court instructed the jury that the stipulated decree was an admission by Dickenson, but no attempt was made to call it a conclusive admission. As instructed, the jury, as to count one, was free to find the defendant not in commerce and that the offsets not disclosed to the court in the first case actually existed, and therefore acquit him on count one. The instructions peculiarly applicable to count one were very favorable to the appellant.

On the issue of the justification of the offsets, the evidence was sharply divided. Obviously, the jury believed Dickenson spoke not the truth. Quite possibly this belief influenced the jury in appraising his testimony on the other counts.

The defendant objects to a number of instructions given and the failure to give others. We have examined all of the objections. Many of the objections now made were not made to the trial court. Therefore, our review of them is exceedingly limited in scope. Many of the objections focus too much on a small segment, overlooking that the instructions are to be taken as a whole. So taken, they are complete, good, and free from any major fault.

The judgment of conviction is affirmed.

### APPENDIX A

Instruction on "retail sales" and the exemption therefor:

Now we come to this question of exemption, and that is the second matter that you should consider. First, as I say, you should consider coverage. Secondly, consider the question of exemption that is claimed by the defendant.

As I said, under the plea of not guilty as to all of the counts, the defendant contends that he is exempt from the pro-

---

8. Fair Labor Standards Act of 1938, § 13 (a) (2), 52 Stat. 1067, as amended, 29 U.S.C. § 213(a) (2).

9. Other witnesses who testified just did not know enough about Dickenson's business for one to say their testimony had to be taken as conclusive. And the jury could disbelieve Dickenson.

visions of the Act for the reason that he operates a retail establishment.

A retail establishment is defined in the Act, in Section 13(a) (2) of the Act, which provides.

"The provisions of sections 6 and 7 shall not apply with respect to * * * (2) any employee employed by any retail or service establishment, more than 50 percentum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located."

There is no question about that. Both the Government and the defendant—or, rather, the Government concedes that more than 50 percent of his sales were made within California. Then it says:

"A 'retail or service establishment' shall mean an establishment 75 percentum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry; * * *."

Typically, a retail or service establishment, is one which sells goods or services to the general public. It serves the every day needs of the community in which it is located. The retail or service establishment performs a function in the business organization of the nation, which is at the very end of the stream of distribution, disposing in small quantities of the products and skills of such organization, and does not take part in the manufacturing process. Such an establishment sells to the general public its food and drink. It sells to such public its clothing and its furniture, its automobiles, its radios and refrigerators, its coal and its lumber, and other goods, and performs incidental services on such goods when necessary. It provides the general public its repair services, and so forth. Illustrative of such establishments are: grocery stores, hardware stores, clothing stores, coal dealers, furniture stores, retaurants, hotels, watch repair establishments, barber shops, hospitals, valet shops, and other such local establishments.

If the business is one to which the retail concept is applicable, then the second requirement for qualifying as a retail or service establishment, within that term's statutory definition, is that 75 percentum of the establishment's annual dollar volume must be derived from sales of goods or services, or both, which are recognized as retail sales or services in the particular industry. In applying this requirement it must be determined whether the sales or services of an establishment are recognized as retail sales or services in the particular industry. The determination must take into consideration the well-settled habits of business, traditional understanding and common knowledge. These involve the understanding and knowledge of the purchaser as well as the seller, the wholesaler as well as the retailer, the employee as well as the employer, and private and governmental research and statistical organizations. The understanding of all these and others who have knowledge of recognized classifications in an industry would all be relevant in the determination of the question.

A wholesale sale, of course, is not recognized as a retail sale. If an establishment derives more than 25 percent of its annual dollar volume from sales made at wholesale, it clearly cannot qualify as a retail and service establishment. It must be remembered, however, that what is a retail sale for purposes of a sales tax law is not necessarily a retail sale for purposes of the statutory definition of the term "retail or service establishment." Similarly, a showing that sales of goods or services are not wholesale does not necessarily prove that such sales or services are recognized in the particular industry as retail.

The distinction between a retail sale and a wholesale sale is one of fact. Typically, retail sales are made to the general consuming public. The sales are numerous and involve small quantities of goods. Wholesale establishments usually exclude

the general consuming public as a matter of established business policy and confine their sales to other wholesalers, retailers, and industrial or business purchasers in quantities greater than are normally sold to the general consuming public at retail. What constitutes a small quantity of goods depends, of course, upon the facts in the particular case and the quantity will vary with different commodities and in different trades and industries. Thus, a different quantity would be characteristic of retail sales of canned tomato juice, bed sheets, furniture, coal, etc. The quantity test is a well-recognized business concept. There are reasonably definite limits as to the quantity of a particular commodity which the general consuming public regularly purchases at any given time at retail and businessmen are aware of these buying habits. These buying habits set the standard for the quantity of goods which is recognized in an industry as the subject of a retail sale. Quantities which are materially in excess of such a standard are generally regarded as wholesale and not retail quantities.

The sale of goods in a quantity approximating the quantity involved in a normal wholesale transaction, and as to which a special discount from the normal retail price is given is generally regarded as a wholesale sale in most industries. Whether the sale of such quantity must always involve a discount in order to be considered a wholesale sale depends upon industry practice. If the practice in the general industry is such that a discount from the normal retail price is not regarded in the industry as significant in determining whether the sale of a certain quantity is a wholesale sale, then the question of whether the sale of such a quantity will be considered as a wholesale sale will be determined without reference to the price. In some industries the sale of a small quantity at a discount may also be regarded as a wholesale sale, in which case it will be treated for the purpose of exemption.

The third requirement for qualifying as a retail or service establishment within the term's statutory definition is that 75 percent of the retail or service establishment's annual dollar volume must be derived from sales of goods or services, or both, which are not made for resale. At least three-fourths of the total sales of goods or services measured by the annual dollar volume must not be for resale.

Except with respect to a specific situation regarding certain building materials, the word "resale" is not defined in the Act. The common meaning of "resale" is the act of "selling again." A sale is made for resale where the seller knows or has reasonable cause to believe that the goods or services will be resold, whether in their original form, or in an altered form, or as a part, component or ingredient of another article. Where the goods or services are sold for resale, it does not matter what ultimately happens to such goods or services. Thus, the fact that the goods are consumed by fire or no market is found for them, and are, therefore, never resold does not alter the character of the sale which is made for resale. Similarly, if at the time the sale is made, the seller has no knowledge or reasonable cause to believe that the goods are purchased for the purpose of resale, the fact that the goods later are actually resold is not controlling. In considering whether there is a sale of goods or services and whether such goods or services are sold for resale in any specific situation, the term "sale" includes "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." Thus, under the definition, sales by an establishment to a competitor are regarded as sales for resale even though made without profit. Similarly, sales for distribution by the purchaser for business purposes are sales for resale under the "other disposition" language of the definition of "sale" even though distributed at no cost to the ultimate recipient.